May it please the Court, Catherine Tassinari for the Plaintiff Appellant, Franklin Lee. Mr. Lee's a man with a very low IQ and there's agreement on his intellectual functioning and also the fact that he has a severe personality disorder. There's some disagreement about exactly what type, but early on the very first psychological evaluation described him as somebody with idiosyncratic thought processes and an appearance of being weird to others, which is consistent with a schizotypal sort of disorder. Did anybody, but nobody found schizo, in fact, I think at least one of the reports said that they did not think he was. Dr. Bassamo diagnosed dependent and schizotypal features. Dr. Redner said that he had at least schizotypal personality disorder. And Dr. Prescott did not diagnose it at all. And she's the only one who examined him during the relevant period. She instead diagnosed him with an avoidant personality disorder. But if you read how she talks about his avoidant personality, it has a lot of some of the flavors of the schizotypal in terms of the avoidance. Personality disorder is a sort of a broad category and the medical profession has trouble sorting out accurately once you get somebody who's, in your word, weird. Let me ask you a slightly different question. It's apparent from the record that he has had a lot of different jobs. He doesn't hold these jobs for a very long time. What he says is, I can get any job I want, I just can't keep them. Right. What's the longest period during which he has ever held a job? Well, I think he testified that he had a job for a year. And what was that job? As a security guard. But the ALJ decided she could not find that he had any job long enough at the substantial gainful employment level to qualify for past relevant work. So past relevant work is looking 15 years back prior to alleged onset date, and she found instead that he had no past relevant work. But what I'm trying to figure out here from the pattern, to the degree that we can figure it out from the pattern, there's prior fairly brief employments, whether that would allow us to draw any inference as to his future employability. Well, I certainly think so. And that's what Dr. Prescott concluded, that based on his job history, she thought that he couldn't sustain the work. He's a difficult client, and he's a difficult case to be looking at, because he's ‑‑ I think he wants to work. And when you see, I think particularly in Dr. Redner's examination, which was right before the relevant period, he wanted to be a security guard again and was getting his evaluation. He was hoping that she would say that he could. But he'd have to carry a gun. Yeah. Which would probably not be a good idea. So I think the fact that he's had numerous jobs shows that he's tried, but just does not have the ability to do well. And there's a thread that you see repeatedly, aside from the personality thing. Both Dr. Prescott and Dr. Redner described him as being severely impaired in his ability to hold a thought in his mind and then process it and then do something with it. And Dr. Bassamo also found something similar when he was saying that he had difficulty with verbal tasks, taking in verbal instructions and then acting on them. So I think that's ‑‑ I think those two problems are really significant. And then in the relevant period, Dr. Prescott also concluded that he suffered from depression. And the ALJ's treatment of Dr. Prescott's diagnosis is peculiar, I think, and inconsistent, because she herself agreed that of the severe impairments, depression was one. But then she also criticized Dr. Prescott for appearing to consider depression as a severe ‑‑ as a disabling factor. I think it's clear from Dr. Prescott's final conclusions that she was considering ‑‑ she talked about his learning and memory impairment, she talked about his depression, and she talked about his avoidance style as being very significant. I'm sorry. Go ahead. The ALJ discounts Dr. Prescott's findings. I'm looking on page 7 of the ALJ's decision. And it says that the undersigned finds the opinions of Dr. Bassamo and Dr. Redner more reliable as they are based on more comprehensive testing and evaluation of his overall history and record. What testing did Dr. Bassamo and Dr. Redner do that Dr. Prescott failed to do? She did do intelligence testing. And it is true they did ‑‑ I think they did more detailed neuropsychological testing. I think it was just a matter of degree, not so much ‑‑ Nobody really disagrees. There's no disagreement among the various psychologists who saw him about his intelligence. Everybody comes up at about the same place. So the fact that Dr. Prescott did intelligence testing really doesn't have much of an impact here. It's really the other kinds of testing that it looks like the ALJ would have been relying on, because there's no disagreement about how smart he was. I think Dr. Redner got slightly higher scores. But the problem is Dr. Bassamo examined him in 1999, and Dr. Redner examined him slightly before the alleged onset date. So ‑‑ Which would have been 2006? No, 2002. Oh, 2002. So technically, their opinions are useful for us. And I'm not saying to disregard them. It's just that we only ‑‑ Dr. Prescott's ‑‑ I have Dr. Prescott's report dated February 2006. That's right, Your Honor. Okay. So there are seven years between those examinations, not three years. Between Dr. Bassamo and Dr. Prescott, yes, sir. Okay. I think when you look at these three examinations, the differences are not that significant and certainly not enough to discount Dr. Prescott, who has the most current point of view. One thing that's ‑‑ Dr. Prescott's opinion, she stands alone here with Dr. Phillips and his observations about plaintiff's difficulty with making and keeping appointments and how he appeared to be possibly mentally retarded or having a cognitive disorder. But, you know, he's not a psychologist. That was just his observation, seeing the man come in for treatment. But in most cases, we have the state agency ‑‑ I know, actually, I'm going to want to reserve a little bit of time. That's okay. We usually have the state agency looking at the psychological reports. And in this case, Dr. Prescott's opinion was not addressed by the state agency reviewing psychologists, nor did they review Dr. Redner's opinion. So the ALJ is on her own here in questioning Dr. Prescott because there is no medical ‑‑ no doctors have questioned Dr. Prescott. Okay. Why don't we hear from the other side, and we'll give you a chance to respond. Your Honors, counsel, may it please the Court. My name is Lisa Goldoftus, and I represent the Defendant Commissioner of Social Security. There is no question that Mr. Lee has mental impairments that impact his ability to work. The only question is whether he meets the definition of disability under the Social Security Act. And the definition you're relying on is? The definition is that due to his impairments, which are expected to last a minimum of 12 months, that he is unable to engage in substantial gainful activity. And what does substantial gainful activity mean? Because I assume based on his past performance that he can get a job and hold it for a little bit. Let's assume a couple of months. Is that substantial gainful activity? If his pattern is every time he gets a job, he loses it? Well, in fact, he did. I'm asking you as a hypothetical that I just gave you. Is that a disability or not? If he could not sustain it, it would be a disability. If he loses his job after a month or two every time he gets one, yeah. That's correct. And so you say that is a disability under the definition? If he couldn't sustain it. Okay. I got it. Okay. But the fact is that he did sustain a job for approximately a year. He worked as a security guard. He was able to do the work. And it isn't clear whether his reasons for quitting are due to these mental impairments. What was other besides the security guard, which he couldn't get back because he couldn't carry a gun, right? He worked at various things such as dishwasher. Again, they were short-term jobs that he apparently either quit or was fired from. Well, the pattern is not encouraging. I mean, it sounds like as a technical matter, because he has at least one job that went a year, but it is troubling that this guy has a whole played-out history of not being able to hold a job. And everybody agrees he's got low intelligence and a certain psychological problem. Right. He does have low intelligence. As the ALJ found, it does not qualify as mental retardation under 1205c. I understand. I mean, he's such a borderline case. To what extent in a borderline case like this does his actual performance, absent finding that he's malingering or, you know, willfully creating a record, what do we do with that kind of a situation? Well, I think that there are some questions about whether it is willful or not. The level of what was troubling to the ALJ was the level of impairment that he was claiming, such as forgetting to turn the television on and just staring at the screen and saying that he didn't even notice that it wasn't on. So I think that there is no express finding of malingering, but there are some troubling questions about it. And what basis does the ALJ have for saying that might not be true? That given the borderline intellectual functioning to low normal, that it does not add up. But the ALJ obviously is not there in the room. So if he says, listen, I can just sit there and stare at the blank screen for a bit without The ALJ has no idea as to whether or not that's true. Right. But the ALJ is tasked with credibility, with a credibility determination. And the ALJ has to look at the entire record to make that determination. And if it doesn't add up, although, again, there may not be express finding of malingering What in the ALJ decision, which I do have here in front of me, in your view is the most damning finding by the ALJ that approaches some sense of malingering or he could fix things if he wanted to and so on? What should I be looking at? I would say that on page 21, when he, when she discusses the, she says that both the claimant and third parties. Okay. I'm on the page. So what paragraph am I on? This is the second full paragraph just before number 6. Okay. Okay. About four lines down, it says, Overall, the reports provided by the claimant and third parties would suggest a severely mentally retarded level of functioning, which is not supported by the objective  I'm sorry. What page are you on? This is page 21 of the ALJ decision. Excuse me. This is page 7 of the ALJ decision. ER-21. Yeah. I read that. In fact, I'd underlined that. But I don't know that he is claiming severe mental retardation because if that were the claim, we would be claiming under a different provision. That's right, but So the fact that the reports provided by the claimant and third party would suggest a severely retarded level of functioning, well, that's not the claim he's making here as a matter of law, is it? The claim is that he can't, he can't remember things. He hangs up the phone and can't remember two minutes later what he talked about. He can't remember to go to work. He can't, once he gets to work, he can't remember to do things. He can't, it takes him hours to make a sandwich. The ALJ, looking at that, in light of the entire record, in light of several different psychological evaluations, detailed psychological evaluations that in fact concluded that he had possibly borderline intellectual functioning but perhaps simply low normal, in light of all of those, the ALJ concluded that it didn't add up. When he went into Social Security, he just sat there and said, I don't know. He, it seemed more willful that he didn't answer questions than that he didn't have the cognitive ability to answer them. What bothers me about this case, from your standpoint, I mean, this is a hard case and we owe some deference to the ALJ. It is a hard case. What bothers me about this case is that the record for this guy is not at all promising in just looking at this without regard to layers of deference and so on, which I eventually do have to pay attention to. He's not employable. I mean, I would never offer him a job. Given his past performance, if I offered him a job, I would have absolutely no expectation that the job would last more than a month or two. What I think came out in the psychological reports, though, and, Your Honor, I would ask that you not give up on this man either in terms of being a productive worker. What came out in the reports is that his ability to learn is significantly different from other people's. He needs to, he's hands-on. He needs to be shown. It would have to be simple, but that was, that came out numerous times, and in fact that is in the RFC, that if he's shown, if he can learn by doing, that he would be able to complete simple tasks. The fact that he can't carry a gun as a security guard doesn't mean that he can't do anything. What happens in the future? Let's assume that we affirm the ALJ or affirm the district court, and ten years down the road, we have more or less the same pattern. He's found a few jobs. He's kept them for a month or two. They never pan out. He gets fired from a few of them. He quits from a couple of them. And he comes back in and says, you know, everything I told you the last time around turns out to be true. Is, does he have a claim, or does he, or is it race judicata as to him, because he's not claiming that anything's different. He says it's the same as it's always been. And I just have now ten years of evidence to back up what I told you was true before. What happens? Well, in fact, I would maintain that there has been change. No, no, no. The depression. Run with my hypothetical. He says nothing's changed. I'm just as unemployable as I was ten years ago, and now I have ten years of continuing pattern to show exactly what I told you the last time. What happens? Right. At that point under the act, he very well may be disabled. No race judicata. That's to say he's not shown any changed conditions. He's saying I'm the same as I always was. With the depression? With everything. So with everything the way that it is today, not when he first filed and not at the end of his DLI, the date last insured. But five, six years later, you're saying from that point forward, he hasn't changed. He hasn't been able to work. Right. Or he's worked in this. You know, he's basically in a steady state. What I'm worried about is race judicata. Mm-hmm. Would that be race judicata? He said, no, no, this is just the way it's always been. I understand your concern. And I would say at that point that additional consultative examinations would be in order to see if something had changed. But if nothing has changed and it's just turning out to be exactly as he predicted, he's stuck? And that's what I'm worried about. Right. Does the administration use the doctrine of race judicata? Yes. That's why I'm asking the question, because I've seen cases like this. Well, none of them are all the same. No case is identical. But I've seen cases in which the claim is, you denied me before, and the administration comes back and says, yeah, but nothing's changed. Yeah. So you're stuck with a prior adjudication. Right. And I see that conundrum. I see. He would have to come back with additional psychological testing of some kind. That is correct. He could be provided with additional. Could the mere passage of time serve as evidence that things had changed, that he now has a much longer history of nonworking and inability to hold a job and so forth? Right. At this point, he is a younger individual. And later in his life, there would be a shift in the grids, as they're known, to determine whether he would be able to do other work. And when does that shift take place? I do know that an older employee or would-be employee is treated differently. When's the shift? That would be ‑‑ I'm sorry. I don't have that right in front of me, but that would be 40s and 50s, that he would ‑‑ that there would be a shift. And he's now about 31? He is in his 30s. Yeah. Okay. Any more questions from the bench? Okay. Thank you. Thank you. And I did, if I may make one more point, I did just want to make the point of the differing date last insured, that there was a 30‑day point in which disability, he could qualify for disability under Title II and the rest would be under Title XVI. And what difference would that make? I'm not as sophisticated enough to know. In terms of the benefits and in terms of when the disability would have to begin, it would ‑‑ Dr. Prescott's evaluation was a number of years after the date last insured, which would mean that he could potentially, if, in fact, this Court did credit hers, that his date of onset would be significantly later and that he could qualify for SSI in that case rather than Title II. Okay. Thank you, Your Honors. Thank you. And the Commissioner does request that you affirm. Thank you. Could you just translate what she said? I'm sure she did it absolutely accurately, but I need help. I understand what she means. The difficulty is that the issue she raised was not an issue that the ALJ discussed whatsoever. So the point, the Commissioner's point is that the claimant applied for disability insurance benefits under Title II and he applied for SSI benefits under Title XVI. He's insured for benefits, however, only up to March of 2002, but he alleged disability as of March 1, 2002. So he was only insured for benefits that one month. So the difficulty is that he has ‑‑ his best evidence is Dr. Prescott, whose opinion, she did not seem to relate back to the last insured date. Okay. Now, this gets you back to the question of dates that I asked you about. So the onset is 2002. 2002, alleged onset. And whose report is most contemporaneous with that? Oh, the closest one would be Dr. Redner, who was a couple months before that. Okay. In 2001 or 2002? She wrote ‑‑ she examined him at the end of 2001 and then wrote a report in 2002. Okay. And so Dr. Prescott is actually seeing him in 2006, so it's four years later. After the alleged onset. She doesn't really have any way in which she says, look, it's pretty clear that he suffered this his whole life or that this has been around for a long time. Yes. Some of these conditions imply kind of ‑‑ we can see they're long‑term conditions. Did Dr. Prescott have access to the previous medical records? She did not. No, Your Honor. She did not. So, okay. So the thing is that with Title II, he would get ‑‑ he has a very poor work history, so if he doesn't get Title II, he'd lose about $300 to $400 a month. On SSI, he'll get something like $692 a month. Compared to? If he gets both of them, then he'd have the $300 or $400 plus the $692, which obviously we would like to see. Now, the difficulty is that I understand the problem with Dr. Prescott, but the difficulty is the ALJ really didn't make this analysis. She didn't look at onset at all. She didn't consider it. So she didn't have to because she found that he wasn't disabled. Exactly. So that didn't come up. Yes. But the other thing, the issue of, you know, race judicata and would he have to show worsening, well, it's not handled very nicely here, but the ALJ was requiring a show of worsening. When you look at page 5 of her decision, the excerpt at 19, one of the things she said was that he didn't show that his cognitive and learning disorders had worsened. And I argued, well, yes, he had shown that because he now has depression added on. So what she doesn't nicely mention here is that he did have a previous application and she found against him in 1999. So she was requiring that worsening, and he would indeed have to show that. Because otherwise it would have been race judicata? Yes, sir. So this is his second. This is actually his second application. This is his second application. He applied. And in 1999, the evidence that she would have had before you would have been largely Dr. Balsamo. That's right. While the rest of it is post-1999. That's right. And how do you respond to the sentence that was read out loud a moment ago on page 21? Overall, the reports provided by the claimant and third parties would suggest a severely mentally retarded level of functioning which is not supported by the objective  And there are a couple of other statements in the ALJ's opinion that say not supported by the objective evidence. How do you respond to that? Well, the thing is, I mean, the whole issue of what – I don't know what – these things are so – vary so much from person to person, it's really hard for me to say whether someone with a cognitive – the ALJ found he had a cognitive disorder, as did some of the examiners, and as well as borderline intellectual functioning. And I don't know if that – I don't see that that's necessarily inconsistent with his claims of severe memory problems. The other thing is the medical – the psychological report is pretty – pretty strong that he can't hold a thought in his brain and process it. And Dr. Redner found that both for auditory issues and for new learning and visual memory. So I don't – I don't see that the claimant was being extreme in his assertions or that his mother-in-law was. Okay. Thank you very much. Okay. Thank both sides for your argument. The case of Lee v. Astor is now submitted for decision. And that's the end of our arguments for this morning. We're adjourned.
judges: Fletcher, Fisher, Bybee